[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 8, 2006
THOMAS K. KAHN
CLERK

No. 06-13120
Non-Argument Calendar

_____

BIA Nos. A96-086-042 & A96-086-054

JUAN CARLOS BOTERO TORO,
EVA PATRICIA CEVALLOS GOMEZ,
JUAN DAVID BOTERO CEVALLOS,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(November 8, 2006)**

Before BLACK, BARKETT and HULL, Circuit Judges.

PER CURIAM:

Juan Carlos Botero Toro ("Botero"), on his own behalf and on behalf of his

wife and minor son, petitions for review of the final order of the Board of Immigration Appeals ("BIA"), which affirmed without opinion the decision of the Immigration Judge ("IJ") denying petitioners' requests for asylum, withholding of removal under the Immigration and Nationality Act ("INA"), and relief under the United Nations Convention Against Torture ("CAT"). After review, we deny the petition.

## I. BACKGROUND

Botero is a native and citizen of Colombia. His wife and son are natives and citizens of Ecuador. All three petitioners were authorized to stay in the United States as visitors for six months, and all three overstayed their visas without permission.

On May 5, 2003, the Department of Homeland Security ("DHS") issued a notice to appear to petitioners, placing each of them in removal proceedings. On January 14, 2004, petitioners appeared before the IJ, admitted the factual allegations and conceded removability, and requested relief in the form of asylum, withholding of removal, and CAT relief.

Botero's asylum application is based on his "lifelong" membership in the Liberal Party of Colombia and his active opposition to the guerilla group known as the National Liberation Army ("ELN"). Botero's application reflects that he entered the United States four separate times: in December 1999; April 2000; May

2

2000; and for the last time, in March 2002.

A supplemental statement attached to Botero's application explains that Botero worked for the Colombian Stock Breeders' Bank (the "Bank") from 1988 until 1999. In 1998, Botero was assigned to work for the Bank in the "Bolivar zone," which is in northern Colombia and, according to Botero, "dominated" by the ELN. While in Bolivar, Botero was assigned to perform a survey of farms and cattle ranches to document working conditions. Botero's survey concluded that ELN guerillas were the source of many problems for Bolivar farmers.

In 1999, based on Botero's survey, the Bank assigned Botero to take charge of an office in the municipality of Arjona, Bolivar, that was dedicated to finding agricultural jobs for local residents, particularly younger residents. Botero's supplemental statement states that his work in Arjona effectuated change in the area, as he was able to recruit younger residents away from the ELN by placing them in jobs and hiding them on other farms, and he became a community leader. Botero then decided to run for the political office of "aedile"—a position akin to a local commissioner—as an independent candidate. The election was to take place in October 2000, and Botero began to campaign door-to-door.

According to the supplemental statement, while campaigning door-to-door, Botero criticized the ELN and gained popularity as a result. Botero claims his work resulted in the construction of a small police station in Arjona. Thereafter,

3

according to Botero, the ELN contacted him by telephone and told him that he "was damaging the zone" and "had to leave the area," and the ELN also sent a letter that threatened him with death if he did not leave. Botero's supplemental statement states that he informed the authorities after he received the letter.

Ultimately, Botero "fled Colombia to Ecuador," to a town near the Colombia border, where he received more threatening phone calls and letters. Botero's supplemental statement says that the furniture in his house was destroyed, but provides no further details. According to his supplemental statement, Botero then fled Ecuador and came to the United States for one year. Finally, Botero's supplemental statement asserts that he returned to Colombia in December 2001, but a month after returning, he received two letters that threatened him and his parents with death, as well as phone calls threatening death. Botero thus fled Colombia again, returning to the United States on March 12, 2002.

On February 28, 2005, Botero testified at length in support of his asylum application. Botero testified that he left Colombia due to political persecution, the threat of kidnaping, and because he feared for his life. Botero testified that he was targeted by the ELN because he "had . . . power" over a certain group of people, as well as an ideology that was diametrically opposed to the ELN's. Botero recounted threatening telephone calls and an October 1999 letter demanding that he leave the country. Additionally, in response to questioning by the IJ, Botero

testified to a threatening visit from a "Commander Francisco" in 1998 or 1999, and that the townspeople alerted Botero to a potential kidnaping attempt in Arjona in September 1999. Botero also testified in response to IJ questioning that there was a potential kidnaping attempt in Ecuador in March 2000 (which his supplemental statement says was avoided because of the intervention of an "Ecuatorian squad"). Botero gave no details about either potential kidnaping.

## II.  DECISION OF THE IJ

After the hearing, the IJ denied petitioners' asylum applications, as well as their requests for withholding of removal and CAT relief. The IJ denied voluntary departure to Botero but granted voluntary departure to Botero's wife and son.

The IJ expressly found that Botero was not credible and also concluded that Botero "failed to provide testimony that was believable, consistent, and sufficiently detailed so as to provide a plausible and coherent basis for his fear of persecution in Colombia." Specifically, the IJ stated that she found it to be clear from the record evidence that Botero and his wife had been "setting up their residence in the United States since at least the year of 1998." The IJ noted that Botero admitted that he and his wife came to the United States in 1998 so that they would have a child born in the United States, and the IJ further noted that Botero "was unable to provide any reasonable explanation as to why he and his wife returned to Ecuador if they came to the United States to have their child born in this country so she

5

could be raised in this country . . . ."

Additionally, the IJ observed that Botero had made several trips to the United States after the ELN's purported persecution had commenced, and stated that as a result, she "did not find believable the underlying facts set forth" by Botero. Specifically, the IJ noted that Botero testified about the failed kidnaping attempt in September 1999; the threatening visit from Commander Francisco in either August 1998 or 1999; and a threatening letter in October 1999, as well as threatening phone calls before then. Botero then came with his entire family to the United States in December 1999 for two to three weeks, but failed to seek asylum or refugee protection at that time. The IJ further noted that Botero came back to the United States in May 2000 and stayed until December 2001, but he did not seek refugee protection or asylum during that time either, despite the fact that he allegedly fled Colombia in October 1999 to avoid ELN persecution. In fact, Botero returned to Colombia in December 2001, and he even renewed his Colombian passport at the Colombian Consul in Miami on July 19, 2000. Further, the IJ noted that Botero did not file his asylum application until March 11, 2003, nearly a year after he last came to the United States.

The IJ further observed that in his initial testimony at the hearing, Botero failed to mention critical details, such as: (1) the alleged March 2000 kidnaping attempt in Ecuador; (2) receiving threatening letters and phone calls when he

6

returned to Colombia in December 2001; and (3) an alleged incident in which his home was shot at and his furniture destroyed. Botero only discussed these incidents upon inquiry by the IJ. The IJ further noted that Botero provided no corroborating evidence as to these purported incidents.

Additionally, the IJ found that an October 1999 police report introduced by Botero in support of his claims was inauthentic. The court observed that Botero's signature, the signature of "Jose A. Zambrano" (the officer receiving the report), and the text of the document were all in the same handwriting. The IJ also observed that the police report bore a Washington state fax number despite Botero's testimony that the fax came directly to Florida from Cartagena, Colombia. Additionally, the IJ observed that Botero did not mention the purported September 1999 kidnaping attempt in the October 1999 police report and gave inconsistent testimony about when he was visited by Commander Francisco.

Finally, the IJ noted that Botero failed to provide any corroborative evidence as to his aedile candidacy—such as a newspaper article or campaign materials such as fliers, speeches, or photographs—and that despite claiming to be a member of the Liberal Party, Botero supposedly ran against a Liberal Party candidate for that aedile position.

The IJ concluded that Botero and his family came to the United States to reside permanently for personal reasons and not on account of past persecution or a

7

well-founded fear of future persecution in Colombia. Accordingly, the IJ denied petitioners' applications for relief, and denied Botero's request for voluntary departure because she found him incredible. The BIA affirmed the IJ's decision without opinion on May 22, 2006, and this petition for review followed on June 2, 2006.

### III. DISCUSSION

### A. Asylum and adverse credibility

An alien who arrives in or is present in the United States may apply for asylum. See 8 U.S.C. § 1158(a)(1). The Attorney General has discretion to grant asylum if the alien meets the INA's definition of a "refugee." See 8 U.S.C. § 1158(b)(1)(A). A "refugee" is

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). The asylum applicant carries the burden of proving statutory "refugee" status. See Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001).

To carry this burden of proving statutory "refugee" status, the alien must, with specific and credible evidence, establish either (1) past persecution on account

8

of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor will cause future persecution.  8 C.F.R. § 208.13(a), (b); see also Al Najjar, 257 F.3d at 1287.  An alien's testimony, if credible, may be sufficient to sustain the burden of proof for asylum.  8 C.F.R. § 208.13(a).  "Conversely, an adverse credibility determination alone may be sufficient to support the denial of an asylum application."  Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1287 (11th Cir. 2005).  Nevertheless, the IJ must still consider all of the evidence submitted by the applicant, including documentation.  Id.  "Once an adverse credibility finding is made, the burden is on the applicant alien to show that the IJ's credibility decision was not supported by 'specific, cogent reasons' or was not based on substantial evidence."  Id.

**B.  Petitioners' claim**

Petitioners contend that the IJ's adverse credibility finding was not supported by substantial evidence.  Upon review of the record, however, we disagree.[1]

The IJ's adverse credibility finding was based on specific, cogent reasons supported by the record.  Among other things, the IJ noted that: (1) Botero made several trips to the United States after the ELN persecution against him supposedly

---

[1]Because the BIA affirmed the IJ's order without opinion, the IJ's decision constitutes the final agency determination to be reviewed by this Court.  Forgue, 401 F.3d at 1285 n.2.

commenced, but did not apply for asylum until 2003; (2) the October 1999 police report appeared to contain a forged signature and to have been faxed to or from Washington state despite Botero's testimony that the police report was faxed directly from Colombia to Florida; (3) Botero failed to supply any corroborating evidence in support of his claim that he ran for aedile;[2] (4) Botero failed to supply any corroborating evidence that he had been threatened upon his return to Colombia in December 2001; and (5) there were various significant inconsistencies and omissions in Botero's testimony before the IJ as compared to his asylum application.

Notably, in his brief to this Court, Botero does not dispute or explain the majority of the IJ's findings as to the adverse credibility ruling. Instead, Botero's brief focuses on the substance of his testimony regarding the purported persecution suffered by Botero and his family in Colombia and Ecuador (the very testimony that the IJ found incredible).

Botero does dispute the IJ's conclusion that the October 1999 police report is inauthentic. For example, Botero contends that the IJ erroneously found the

_____

[2]Our review of the record did reveal a March 19, 2003 letter from the General Secretary of the Liberal Party of Colombia, which states that Botero is a member of the Colombian Liberal Party and sought to become a candidate for aedile for Arjona for the 2001 elections. While it appears that the IJ failed to discuss this document, we note that the letter does not state that Botero was running for aedile for the October 2000 elections (as he claimed in his application and testimony before the IJ), and we further note that the letter does not state that Botero ever actually was a candidate for aedile (it only states that he "wanted to become a candidate"). Accordingly, this letter does not impact the IJ's adverse credibility determination.

10

police report inauthentic on the basis of the purported signature inconsistencies. According to Botero, he filed the report in Colombia and completed the entire report himself, so it is "not surprising or unusual at all that the form is filled out in Botero's handwriting." Botero points to a letter from Jose A. Zambrano in the record that reflects Zambrano's "genuine signature," which Botero concedes "looks nothing at all like the handwriting or signature of Botero . . . ." The problem with Botero's argument in this regard is that it does not explain why Botero, rather than Zambrano, completed the section in the police report where Jose A. Zambrano was supposed to sign as the officer receiving the complaint in the police report. In any event, as detailed above, substantial evidence supports the IJ's finding that Botero was not credible and the IJ's determination that petitioners failed to establish eligibility for asylum.[3]

## III. CONCLUSION

Based upon the foregoing, we deny the petition for review.

**PETITION DENIED.**

---

[3]Because petitioners failed to present credible evidence that they were eligible for asylum, they likewise failed to establish eligibility for withholding of removal or CAT relief. See Al Najjar, 257 F.3d at 1292-93.